FILED
U. S. DISTRICT COURT
Eastern District of Texas

MAR 0 1 2004

DAVID MALAND, CLERK
By
Deputy _____

N THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| VISTO CORPORATION, | § | |
| | § | |
| PLAINTIFF, | § | CIVIL ACTION NO. 2-03CV-332 TJW |
| | § | |
| V. | § | (JURY TRIAL DEMANDED) |
| | § | |
| INFOWAVE SOFTWARE, INC. | § | FILED UNDER SEAL |
| | § | |
| DEFENDANT. | § | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Robert M. Chiaviello, Jr.
Texas Bar No. 04190720
bobc@fulbright.com
Brett C. Govett
Texas Bar No. 08235900
bgovett@fulbright.com

FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, TX 75201-2784
Telephone:  (214) 855-8000
Facsimile:  (214) 855-8200

ATTORNEYS FOR DEFENDANT
INFOWAVE SOFTWARE, INC.

OF COUNSEL

Otis Carroll
Texas Bar No. 03895700
otiscarroll@icklaw.com
J. Wesley Hill
Texas Bar No. 24032294
wesleyhill@icklaw.com
IRELAND, CARROLL & KELLEY, P.C.
6101 S. Broadway, Suite 500
Tyler, Texas 75703
Telephone:     (903) 561-1600
Facsimile:     (903) 581-1071

Paul Krieger
Texas Bar No. 11726470
pkrieger@fulbright.com
Dudley Oldham
Texas Bar No. 15248000
doldham@fulbright.com
FULBRIGHT & JAWORSKI L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77010
Telephone:     (713) 651-5151
Facsimile:     (713) 651-5246

## TABLE OF AUTHORITIES

Page

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................... 3

I.  Visto's "claim constructions" are contrary to law and  preclude issuance of a preliminary injunction ............................................................................... 4

    A.  Visto's claim construction improperly ignores the "synchronization" limitation of the "e-mail synchronization module" .................................................................................................... 5

    B.  Claim 31 includes limitations that are subject to § 112, ¶ 6 ...................... 6

II.  Visto fails to demonstrate a likelihood of success on the merits ........................... 9

    A.  Even under its own flawed constructions, Visto fails to prove that Infowave infringes ................................................................................ 9

    B.  The Symmetry Products do not meet neither the "Synchronization" or the "Central Mail Store" Limitations................................................... 10

        1.  The term "synchronization" means an active process for maintaining consistency through comparison of the state of versions of messages on an email client, global server, and end user devise, i.e., not merely forwarding email ..................... 11

        2.  The term "central mail store" means a server that acts as a third party administrator, storing independently modifiable copies of work space data, translating data formats, and synchronizing work space data .................................................... 12

        3.  The Symmetry Products do not meet the "synchronization" or "central mail store" limitations................................................ 14

        4.  Visto Cannot Show Infowave Made, Used or Sold a Symmetry Product in the United States ...................................... 16

    C.  Visto has not shown that the '590 Patent is likely valid .......................... 18

III.  The remaining factors weigh against preliminary injunction .............................. 19

    A.  Visto will not suffer irreparable harm.................................................... 19

        1.  The "presumption" of irreparable harm is inapplicable............... 19

        2.  Visto's unclean hands and undue delay in bringing this action is incompatible with its claim of irreparable harm........... 19

    B.  The balance of hardships and public interest are in Infowave's favor ...................................................................................................... 21

IV.  Amount of Bond ........................................................................................... 21

CONCLUSION..................................................................................................... 24

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343
(Fed. Cir. 2001) ................................................................................................4, 9, 16, 17

*Bell & Howell Document Mgmt. Products Co. v. Altek System*, 132 F.3d 701
(Fed. Cir. 1998) ..............................................................................................................5

*Citibank v. Citytrust*, 756 F.2d 273 (2d Cir. 1985) ......................................................19

*Deepsouth Packing Co., Inc. v. Laitram Corp.*, 406 U.S. 518, 527 (1972) ..................17

*Deweese v. Reinhard*, 165 U.S. 386 ..............................................................................19

*Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553 (Fed. Cir.
1995) ................................................................................................................................6

*General Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272
(Fed. Cir. 1992) ...............................................................................................................6

*Glaxo Grp. Ltd. v. Ranbaxy Pharms., Inc.*, 262 F.3d 1333 (Fed. Cir. 2001) .................5

*Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580 (Fed. Cir. 1996) ....................7

*H.H. Robertson Company v. United Steel Deck, Inc.*, 820 F.2d 384 (Fed.
Cir. 1987) ..................................................................................................................18, 20

*High Tech. Medical Instr., Inc. v. New Image Industrial, Inc.*, 49 F.3d
1551 (Fed. Cir. 1995) ................................................................................................18, 19

*Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240 (1933) .........................19

*Lantech, Inc. v. Keip Machine Co.*, 32 F.3d 542 (Fed. Cir. 1994) ..................................6

*Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206 (Fed. Cir. 1998); ......................7

*Mead Johnson & Co. v. Abbott Laboratoriess*, 201 F.3d 883 (7th Cir. 2000) ..............22

*Micro Chemical, Inc. v. Great Plains Chemical Co.*, 194 F.3d 1250 (Fed. Cir.
1999) ................................................................................................................................7

*Phillips v. Casualty Schreiner Bank*, 894 F.2d 127 (5th Cir. 1990) .............................21

## TABLE OF CONTENTS
(continued)

Page

*Raytheon Co. v. Roper Corp.*, 724 F.2d 951 (Fed. Cir. 1983)..........................................................7

*Reebok International, Ltd. v. J. Baker, Inc.*, 32 F.3d 1552 (Fed. Cir. 1994) ...................................9

*Smith International, Inc. v. Hughes Tool Co.*, 718 F.2d 1573 (Fed. Cir. 1983) ............................18

*SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 859 F.2d 878
(Fed. Cir. 1988)..............................................................................................................................9

*Southwall Techs. Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir. 1995) .....................................8

*T.J. Smith & Nephew Ltd. v. Consolidated Medical Equipment, Inc.*, 821
F.2d 646 (Fed. Cir. 1987).............................................................................................................19

*Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357
(Fed. Cir. 2002)...............................................................................................................................9

*Tenement Co. v. Hako Minuteman, Inc.*, 651 F. Supp. 945 (N.D. Ill. 1986) .................................18

*Texas Instruments Inc. v. United States International Trade Commission*,
988 F.2d 1165 (Fed. Cir. 1993).....................................................................................................6

## FEDERAL STATUTES

35 U.S.C. § 112, ¶ 6.........................................................................................................................7

## MISCELLANEOUS

13 *Moore's Federal Practice* § 65.50[3] at 65-94 ........................................................................20

Wright & Miller, 11A *Federal Practice & Procedure* § 2954 at 292 (2d ed.
1995) ...............................................................................................................................................21

Defendant Infowave Software, Inc. ("Infowave") respectfully submits this its Response to Plaintiff Visto Corporations' ("Visto") Motion for Preliminary Injunction.

## **INTRODUCTION**

Founded in 1984, Infowave has researched, developed, and provided wireless messaging software since 1993.[1]   Infowave currently offers four separate Symmetry products: (1) Symmetry Pro Workgroup, which supports a small workgroup or department using a peer-to-peer mode;[2] (2) Symmetry Pro Enterprise, which supports a large number of users across multiple Microsoft Exchange Servers; (3) Symmetry Pro, which are desktop applications that supports a single user; and (4) Symmetry Express, which is also a desktop application that supports a single user (collectively "Symmetry Products").

As will be more fully explained in the discussion that follows, the Symmetry Products do not infringe U.S Patent No. 5,961,590 (the "'590 Patent"). The '590 Patent claims remote synchronization of e-mail either wirelessly or over the internet, and Visto knows that the Symmetry Products do not include this synchronization. [3]

Visto obtained detailed knowledge of both the existence and operation of the Symmetry Products, at the end of 2002, when Visto and Infowave engaged in merger discussions. In connection with these discussions, the parties entered a confidentiality agreement and exchanged confidential information. *See, e.g.,* Exhibit 6, Reznik Declaration at 1-2. Infowave provided full

---

[1] Infowave was formed in 1997 through an amalgamation of GDT Softworks, Inc., Infowave Wireless Messaging, Inc., and G.W. McIntosh Holdings Ltd.  These three entities were formed, respectively, in 1993, 1996, and 1978. *See* Exhibit 10, Infowave 2002 10-K at 1, 32.

[2] A peer-to peer architecture is a "network of two or more computers that use the same program or type of program to communicate and share data.  Each computer, or *peer*, is considered equal in terms of responsibilities and each acts as a server to the others in the network." MICROSOFT DICTIONARY at 397.

disclosure to Visto of its financial plans, corporate strategy, management reports, and product information. *See id.* Specifically, Infowave provided Visto with detailed information concerning the operation of the Symmetry Products.

Visto did not accuse the Symmetry Products of infringing the '590 Patent during the initial merger discussions, presumably, because Visto correctly determined that the Symmetry Products did not include synchronization. Specifically, Mason Ng, the Visto Director of Product Management, informed Daniel Mendez, the Visto Chief Technology Officer, that:[4]

> The ***biggest weakness of the Infowave solutions*** . . . is the requirement that the user periodically ActiveSync the device (by cradle or IR): The Infowave client does only Send/Receive OTA [over the air]; it ***does not synchronize*** deletes and read status changes OTA.   The deletes and read status changes are synchronized only via ActiveSync.  Thus, the user is tied to a PC— at least for corporate Email.

Exhibit 1 Ng 4/30/2002 email to Mendez.[5]

Indeed, Visto personnel repeatedly advised Mendez that the Infowave products do not synchronize. *See, e.g.,* Exhibit 2 Ng 4/15/2002 email to Mendez (noting that "Full OTA Sync" is a feature "available on Visto but not Infowave" products);  Exhibit 3 Ng 4/16/2000 email to Mendez (noting that "[w]hile Symmetry Pro does have OTA send/receive, it does not have OTA sync of deletes and read actions.  Thus, the user must still cable/infrared synch with his PC.");  Exhibit 4, Ng 4/17/2000 email (same).

Why then would Visto burden this Court and Infowave with this lawsuit and request for preliminary injunction?   Because, despite the absence of synchronization, the Symmetry

---

[3] Indeed, the resume of the lead inventor and Visto's Chief Technology Officer, Daniel Mendez, explains that his invention is "remote synchronization." *See* Exhibit 11, Mendez Resume.

[4] *See* Exhibit 7, Visto Organizational Chart.

Products are superior to Visto's products. *See, e.g.,* Exhibit 3, Ng 4/16/2000 email to Mendez (noting that "[t]he Symmetry Pro client has more features than Visto's. In fact, Visto is missing the following six "A" level features. . . . Compared to Visto, Symmetry is missing only one "A" level feature. . . ."). That Visto's Motion and this action are nothing more than an expensive litigation tactic designed to eliminate from the marketplace these superior products[6] is confirmed by: (1) Visto's choice ***not*** to inform the Court of its prior, failed attempts to purchase Infowave's Symmetry product line; and (2) Visto's choice ***not*** to inform this Court and ***not*** to inform its own expert that Visto previously determined that the Symmetry Products do not perform remote synchronization.

For each of the following reasons, Visto's Motion should be denied in all respects:

1. Visto's Motion fails to provide a claim construction;

2. Visto fails to present any evidence that the Symmetry Pro or Symmetry Express product infringes;

3. No Symmetry Product satisfies the "e-mail synchronization" limitation;

4. No Symmetry Product made, used or sold in the U.S. satisfies all of the claim limitations;

5. Visto will not likely prove that the asserted claim is valid; and

6. Visto's unclean hands, the absence of irreparable harm, the balance of hardships, and the public interest strongly weigh against issuance of a preliminary injunction.

## ARGUMENT

To warrant a preliminary injunction on its claim of patent infringement, Visto must show: (1) a likelihood of success on the merits; (2) irreparable harm if an injunction is not granted; (3) a

---

[5] Unless otherwise indicated, all emphasis added.

balance of hardships tipping in its favor; and (4) the injunction's favorable impact on the public interest. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001). Failure to prove the first two factors is dispositive. *Id.* ("Our case law and logic both require that a movant cannot be granted a preliminary injunction unless it establishes both of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm.") Visto has failed to make the required showing for not only the first two, but for all four factors.

## I.    VISTO'S "CLAIM CONSTRUCTIONS" ARE CONTRARY TO LAW AND PRECLUDE ISSUANCE OF A PRELIMINARY INJUNCTION

Claim construction is the critical first part of an infringement and validity analysis. As explained by the Federal Circuit "[o]nly when a claim is properly understood can a determination be made whether the claim 'reads on' an accused device or method. . . ." *Amazon.com*, 239 F.3d at 1351.

Visto concedes that a claim construction is required. *See* Visto's Motion at 5-6. Nevertheless, Visto has failed to provide the Court with a complete claim construction. Indeed, Visto has resisted discovery from Infowave "on the ground that it is premature and because it implicates claim construction issues that have yet to be resolved at a Markman hearing."[7] Among other things, Visto has objected to providing "documents concerning the scope or construction of the claims of the ['590] Patent" "at least until after the Claims Construction Proceedings have concluded." *Id.* at 4.

---

[6] Indeed, Visto has publicly stated that it intends to "be the last man standing" in the pertinent competitive market segment, and Visto recently raised $50 Million that its Chief Executive Officer admittedly plans to spend a good deal of in Court. Exhibit 5, Jon Fortt, *Visto Alleging Patent Violations,* The Mercury News, Sept. 25, 2003.

[7] *See* Exhibit 8, Defendant's Motion to Stay the Preliminary Injunction Hearing, Motion to Compel Visto to Respond to Infowave's Interrogatories and Requests for Production, and Brief on Support at 3.

As explained below, to the extent that Visto offers any claim construction at all, it is legally erroneous. Granting a preliminary injunction based upon an erroneous claim construction constitutes an abuse of discretion. *See Glaxo Grp. Ltd. v. Ranbaxy Pharms., Inc.,* 262 F.3d 1333, 1339 (Fed. Cir. 2001) ("The district court made an error of law in its claim construction and thereby abused its discretion in granting a preliminary injunction. . . ."); *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys.,* 132 F.3d 701, 708 (Fed. Cir. 1998) ("Because the district court determined the likelihood of infringement based on an incorrect claim construction, we must remand for a determination whether [plaintiff] has shown that it will likely succeed in proving infringement."). Accordingly, Visto's failure to provide a complete and competent claim construction, alone, requires the Court to deny Visto's Motion.

A. **VISTO'S CLAIM CONSTRUCTION IMPROPERLY IGNORES THE "SYNCHRONIZATION" LIMITATION OF THE "E-MAIL SYNCHRONIZATION MODULE"**

Conspicuously absent from Visto's proposed claim construction of the "e-mail *synchronization* module" is the synchronization limitation:

> The term "an e-mail synchronization module for using a predetermined criterion to determine whether to send e-mail to a central mail store" refers to an e-mail module for using a predetermined criterion to determine whether to send e-mail to a central mail store, such as element 1025 in Fig. 10 of the Patent. . .

Visto's Motion at 7. (It is not surprising that Visto attempts to delete the "synchronization" limitation when its own documents evidence its earlier determination that the Symmetry Products do not include "synchronization.")

In ignoring "synchronization," Visto's construction of the "email synchronization module" violates a central tenant of Patent Law. Every limitation in a claim is material. *See*

*General Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1280 (Fed. Cir. 1992). Indeed, controlling authority precludes a claim construction that renders even some claim language mere surplusage. *See, e.g., Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995); *Texas Instruments Inc. v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) (refusing to adopt an asserted claim construction that would render the "disputed claim language mere surplusage" and opining that "to construe the claims in the manner suggested . . . would read an express limitation out of the claims"). That is, patent claims must be interpreted to give meaning to *all* claim limitations. *See Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 546 (Fed. Cir. 1994) (rejecting an interpretation that would render "at least two" meaningless).

The Court must reject Visto's proposed claim construction because it improperly reads the "synchronization" limitation out of the "email synchronization module." Accordingly, for this reason alone the Court must also deny Visto's Motion.

**B.     CLAIM 31 INCLUDES LIMITATIONS THAT ARE SUBJECT TO § 112, ¶ 6**

Even though Claim 31 is drafted in terms of functional limitations rather than structural limitations, Visto ignores the requirements of § 112, ¶ 6. For example, Claim 31 includes the following functional limitations:

- an e-mail engine **for obtaining** e-mail from a mail server;

- an e-mail synchronization module **for using** a predetermined criterion to determine whether to send e-mail to a central mail store;

- a web engine. . . **for sending** e-mail to the central mail store.

- a synchronization-start module **for using** a start criterion to determine when to initiate synchronization with the central mail store.

*See* Exhibit 9, Weinstein Declaration at 16-17.

Use of generic functional limitations like the above is permissible under 35 U.S.C. § 112, ¶ 6.  Where a patentee seeks the benefits of § 112, ¶ 6, a two step construction process is mandated.  The first step in construing a § 112, ¶ 6 limitation is a determination of its function. *See Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).  The second step is a determination of the corresponding structure described in the specification that performs the function. *See id.*  Visto's claim construction fails to undertake either required step.

Visto will expectedly argue that the absence of "means for" removes the functional limitations from the gambit of § 112, ¶ 6.  The absence of the word "means" in a claim limitation creates a rebuttable presumption that § 112, ¶ 6 does not apply. *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1584 (Fed. Cir. 1996).  The rebuttable presumption will "collapse when an element lacking the term 'means' nonetheless relies on functional terms rather than structure or material to describe performance of the claimed function." *Micro Chem. Inc.*, 194 F.3d at 1257 (citation omitted).  Consequently, the Federal Circuit has construed limitations lacking "means for" language as means-plus-function limitations. *See, e.g., Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1213-14 (Fed. Cir. 1998) (holding that (1) a "lever moving element for moving the lever from its disengaged position" was a § 112, ¶ 6 limitation because "lever moving element" had no generally understood structural meaning in the art and was described in terms of its function rather than its structure and (2) "movable link member for holding the lever out of engagement . . . and for releasing the lever after entry of the combination" was a § 112, ¶ 6 limitation because the claim element lacked "any structure."); *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983) (construing functional language introduced by "so that" to be equivalent to "means for" claim language).

To the extent that any structure is present in the functional limitations, the structure lacks a generally understood meaning. *See* Exhibit 9, Weinstein Declaration at 16-17. Moreover, during the prosecution of the '590 patent, Visto itself treated as indistinguishable (1) the limitations of Claim 1 that are explicitly drafted in classical "means for" format and (2) the functional limitations of Claim 31. Specifically, Visto argued:

> Claim 1 as amended recites a "client" system which includes "means for obtaining e-mail from a mail server" and "means for . . . determining whether to send e-mail to a central mail store." Accordingly, the system as claimed synchronizes e-mails on the client regardless of the origin of the e-mails. [Prior art] does not anticipate synchronizing a client system. [Prior art] does not anticipate determining whether to send e-mail to a central mail store. For at least these reasons, Applicants submit that claim 1 as amended is novel and non-obvious over the prior art. Similarly, for at least these reasons, Applicant submits that [claim 31 is] novel and non-obvious over [prior art].

Exhibit 12, '590 Patent Prosecution History, March 24, 1999 Amendment at 7.

Stated otherwise, one argument that Visto advanced in support of the patentability of Claim 1 was the presence of § 112, ¶ 6 limitations. By arguing that Claim 31 was patentable for the same reasons as Claim 1, Visto conceded that the functional limitations of Claim 31 are also § 112, ¶ 6 limitations. Visto may not now advance a different argument. *See Southwall Techs. Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) (holding that "[c]laims may not be construed one way in order to obtain their allowance and in a different way against accused infringers").

Because the functional limitations are subject to § 112, ¶ 6, Visto's Motion is premised upon a legally erroneous claim construction and its requested relief must be denied.

## II.   VISTO FAILS TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS

To demonstrate a likelihood of success on the merits on its patent infringement claim, Visto must show that (1) Visto will likely prove that Infowave infringes the '590 patent, and (2) Visto's infringement claim will likely withstand Infowave's challenges to the validity of the '590 patent. *See Amazon.com*, 239 F.3d at 1350. Federal Circuit authority requires that a preliminary injunction *not* issue if Infowave asserts an infringement or invalidity defense that Visto cannot prove "lacks substantial merit." *Id.* 239 F.3d at 1351. Because a preliminary injunction is an extraordinary remedy, likelihood of success on the merits—including validity and infringement—must be shown clearly. *See Reebok International, Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed. Cir. 1994).

### A.   EVEN UNDER ITS OWN FLAWED CONSTRUCTIONS, VISTO FAILS TO PROVE THAT INFOWAVE INFRINGES

In order to establish infringement, the patentee must prove that the accused product includes each and every limitation of a properly construed asserted claim. *See Tate Access Floors, Inc.   v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1365 (Fed. Cir. 2002); *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988). Visto fails to satisfy its burden.

The only evidence that Visto presents concerning the four accused products is a Technical White Paper that describes *only* two of the products. That is, Visto fails to present any evidence concerning the Symmetry Pro or Symmetry Express products, let alone evidence that either product infringes any claim of the '590 Patent. Because Visto fails to present any evidence concerning the Symmetry Pro or Symmetry Express products, the Court must deny Visto's Motion to the extent it seeks any relief concerning such products.

In addressing the Symmetry Pro Workgroup and Symmetry Pro Enterprise products, Visto's reliance upon the Head Declaration and the Technical White Paper is misplaced. *See* Visto's Motion at 9. Although the Head Declaration purports to identify in the attached Exhibit C "where the respective claim elements of claim 31 of the '590 Patent are present in the Infowave products," it fails to do so. *See* Head Declaration, Exhibit C at p.2 ("This description from Infowave describes a 'web engine.'"). For example, Exhibit C only identifies where a single claim limitation is purportedly found in the Symmetry Products – the "web engine" limitation. Exhibit C otherwise fails to identify where the remaining five limitations are found in the Symmetry Products. Instead, Exhibit C provides an uncorrelated discussion of the Technical White Paper and Claim 31. This discussion does not satisfy Visto's burden of establishing infringement.

Because Visto has failed to satisfy its burden of proving a likelihood of success on the infringement issue, the Court should deny its Motion.

**B.    THE SYMMETRY PRODUCTS DO NOT MEET EITHER THE "SYNCHRONIZATION" OR THE "CENTRAL MAIL STORE" LIMITATIONS**

Claim 31 depends from Claim 23. The second limitation of claim 23 provides as follows:

> an e-mail *synchronization* module for using a predetermined criterion to determine whether to send e-mail to a *central mail store*

As explained below, none of the Symmetry Products include "synchronization" or a "central mail store" as those terms are used in the '590 Patent.

    **1.**    **The term "synchronization" means an active process for maintaining consistency through comparison of the state of versions of messages on an email client, global server, and end user devise, i.e., not merely forwarding email**

The '590 Patent defines the term "synchronization" as maintaining consistency through comparison of the state of versions of messages on an email client, global server, and end user device, *i.e.*, not merely forwarding email. Examples found in the specification include the following:

> The e-mail synchronization module 1025 further includes routines for *comparing* the receipt date of each downloaded e-mail 865 or 899 *against a last synchronization signature* 1035 (such as a last synchronization date and time) *to determine* which e-mails have not been sent to the global server 835.

Exhibit 13, '590 Patent at 15:25-31.

> The e-mail synchronization module 1025 in step 1440 determines whether any of the downloaded e-mails 865 or 899 (which include the client e-mails 875 or 896 recently downloaded) have not been sent to the global server 835. This *comparison* may be performed by examining the date and time the e-mail was received *against a last synchronization signature* 1035 which indicates the date and time of last synchronization. For example, if an e-mail was received after the date and time of last synchronization, the e-mail has not been sent.

*Id.* at 17:64-18:6; *see also, id.* at 8:14-21 ("Computing the changes made may be performed by *examining the current status against the previous status as of the last synchronization* or by comparing the two versions."); *id.* at 10:3-17 ("The general synchronization module 425 and the general synchronization module 515 in step 735 determine whether any workspace elements have been modified. That is, the general synchronization module 425 in step 740 *examines the version information* 255 or 150 of each selected workspace element in the workspace data 136 or 116 *against the last synchronization signature* 435 to locate modified workspace elements.").



**FIG. 14**

That synchronization is a comparison of the current status against the previous status as of the last synchronization to determine changes is further illustrated above in Figure 14.  Exhibit 13, '590 Patent at Figure 14 (emphasis added).   Step 1440 illustrates a comparison that determines whether emails have not been sent to the global server.  The only way this may be determined is through a comparison to what was previously downloaded.

In accordance with the teaching of the '590 Patent, "synchronization" means an active process for maintaining consistency through comparison of the state of versions of messages on an email client, global server, and end user devise, *i.e.*, not merely forwarding email.  *See* Exhibit 9, Weinstein Declaration, at 22.

2.     **The term "central mail store" means a server that acts as a third party administrator, storing independently modifiable copies of work space data, translating data formats, and synchronizing work space data**

Although the claims of the '590 patent use the term "central mail store," the term is not found in the specification of the '590 patent.  The '590 patent discloses a "global server," which

Dr. Head, Visto's Expert, identifies as the preferred embodiment of the "central mail store." *See*

Head Declaration, Exhibit C at 1.

The '590 Patent defines the global server as follows:

> FIG. 11 is a block diagram illustrating details of the global server 835, which includes a CPU 1105, a communications interface 1110, a data storage device 1120 and RAM 1125, each coupled to a signal bus 1115. The communications interface 1110 is coupled via the global firewall 880 (FIG. 8) to the communications channel 825.

Exhibit 13, '590 Patent at 16:7-12.

> *The global server 106 acts as a third party administrator.* The global server 106 *stores independently modifiable copies* of selected portions of the workspace data 136 and 116, collectively referred to herein as workspace data 120. Accordingly, the workspace data 120 includes an independently modifiable copy of each workspace element in the selected portions of the workspace data 136 and 116 and an independently modifiable copy of each corresponding version information 255 (FIG. 2) and 150. The version information copies are collectively referred to herein as version information 148, and are also described with reference to FIG. 2.
>
> The global server 106 maintains the workspace data 120 in a format, referred to as a "global format," which is selected to be easily translatable by the global translator 122 to and from Format A and to and from Format B.

*Id.* at 4:46-61.

> The global server 835 includes a *synchronization agent 885* for cooperating with the e-mail synchronization system 860 or the e-mail synchronization system 898 to *synchronize* electronic mail therebetween. Based on its configuration, the e-mail synchronization system 860 or 898 *translates* and sends to the synchronization agent 885 either a copy or the original (i.e., not maintaining a copy) of a downloaded e-mail 865 or 899 or a client e-mail 875 or 896. The global server 835 stores the copies or originals of the downloaded e-mails 865 or 899 in one or more folder structures as "downloaded e-mails 832," and stores the copies or originals of the client e-mails 875 or 896 in one or more folder structures as "client e-mails 895."

*Id.* at 12:54-66. *See also id.* at Figure 1 (illustrating global format workspace data 120, version information 148, global translator 122, and synchronization agent 124 of global server 100); *id.* at Figure 2 at 830 (illustrating global firewall 880, synchronization agent 885, web interface 890, client emails 895, and downloaded emails 832 of global server 830).

Based upon the intrinsic evidence of the '590 Patent, one of ordinary skill in the art would conclude that the term "central mail store" means a server that acts as a third party administrator, storing independently modifiable copies of work space data, translating data formats, and synchronizing work space data. *See* Exhibit 9, Weinstein Declaration at 22.

### 3. The Symmetry Products do not meet the "synchronization" or "central mail store" limitations

The Visto Director of Product Management was correct when he repeatedly informed senior Visto personnel that the Infowave products do not synchronize. *See, e.g.,* Exhibit 1 Ng 4/30/2002 email to Mendez (describing as "[t]he biggest weakness of the Infowave solutions" that "[t]he *Infowave* client does only Send/Receive OTA [over the air]; it *does not synchronize* deletes and read status changes OTA.").

Dr. Weinstein reached the same conclusion as Mr. Ng: "It is my opinion that no Symmetry product includes the claimed email synchronization module. . . . The Symmetry products merely redirect email." Exhibit 9, Weinstein Declaration at 17. Dr. Weinstein further explained:

> How, then can [Dr. Head, Visto's Expert,] assert that the limited *redirection* functions of the Infowave products, that do not update or carry out any kind of consistency or currency operation, infringe the '590 patent? In particular, in comparing '590 claim 23 with the Infowave Symmetry Pro Technical White Paper, [Dr. Head] is only able to show that the Infowave products allow use of certain predetermined criteria for redirecting email, which *by itself* is only a forwarding service and not "synchronization" at all. Simply using "predetermined criteria" for when to ship out messages is a

practice that probably began with stone tablets thousands of years ago, a practice that does not infringe '590. Dr. Head does *not* succeed in demonstrating "synchronization" in the Infowave products, and therefore they do not infringe the claimed synchronization innovation of the '590 patent. To put it simply: the Infowave products *do not* perform synchronization in the sense of the '590 patent and Dr. Head's declaration.

*Id.* at 15-16 (emphasis original).

In addition to the absence of the claimed synchronization, Dr. Weinstein also determined that the Infowave products do not include the claimed central mail store. *Id.* at 17. He prepared the following figures to illustrate his opinions:



Figure 1. Dr. Weinstein's interpretation of the patent '590 architecture



Figure 2. Symmetry Pro architecture.[8]

As illustrated in Dr. Weinstein's figures and as set forth in his declaration, the Infowave Gateway cannot satisfy the "central mail store" because it cannot and does not act as a third party administrator, store independently modifiable copies of work space data, translate data formats, and synchronize work space data.

Because the Symmetry Products include neither the claimed synchronization nor central mail store, the Court should deny Visto's requested relief.

### 4.    Visto Cannot Show Infowave Made, Used or Sold a Symmetry Product in the United States

Visto relies heavily on Infowave's Gateway in supporting its allegation that Infowave's Symmetry Product infringes Visto's patent.  In Visto's claim chart, attached as Exhibit C to its motion, Visto identifies the Gateway as the essential central mail store element of both the communications module and web engine limitations.  In addition to demonstrating that the accused Infowave Symmetry products do not meet the "central mail store" claim limitation,

---

[8] Attached as Exhibit 14 are the documents that Dr. Weinstein relied upon concerning the Infowave products.

Infowave also demonstrates that the accused Gateway has not been made, used or sold in the United States. Section 271 of 35 U.S.C. requires that the accused infringing activity must take place within the territorial limits of the United States. Sal Visca, Infowave's Chief Technical Officer, states in his declaration attached as Exhibit 16, "Infowave has never made, used or sold an Infowave Gateway in the United States." (Visca Dec., ¶2). The U.S. Supreme Court in *Deepsouth Packing Co., Inc. v. Laitram Corp.*, 406 U.S. 518, 527 (1972) held that 35 U.S.C. §271 "makes it clear that it is not an infringement to make or use a patented product outside the United States." The Supreme Court went on to note that "our patent system makes no claim to extraterritorial effect" and refused to find infringement of Laitram's patent where the device was completed outside the United States. *Deepsouth Packing Co., Inc.,* 406 U.S. at 531. The statute was subsequently amended to cover sales of a device where the unassembled parts were manufactured in the United States, but such are not the facts of this case. Here, Infowave's Chief Technical Officer states that "[t]he only Infowave Gateway(s) ever made, used or sold by Infowave are physically located outside of the United States." (Visca Dec., ¶3). Mr. Visca also states that no Infowave Gateway "has ever been shipped into the United States or delivered to a United States customer." (Visca Dec. ¶4). Finally, Mr. Visca states that "Infowave has no orders for delivery of an Infowave Gateway to any customer located in the United States." (Visca Dec. ¶5). Based on Mr. Visca's declaration, it is undisputed that Infowave's accused Symmetry Products, including the Infowave Gateway, fail to meet the requirements of 35 U.S.C. §271. Visto cannot show that Infowave's Symmetry Products were made, used or sold in the United States; therefore, its motion must be denied.

## C.    VISTO HAS NOT SHOWN THAT THE '590 PATENT IS LIKELY VALID

To avoid preliminary injunction, Infowave does not have to prove that the '590 patent is invalid. "Validity challenges during preliminary injunction proceedings can be successful, that is, they may raise substantial questions of invalidity, on evidence that would not suffice to support a judgment of invalidity at trial." *Amazon.com*, 239 F.3d at 1358. "Vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial." *Id.* Although the burden of showing invalidity at trial is on Infowave, "[w]hen moving for the extraordinary relief of a preliminary injunction, a *patentee* . . . must, however, present a clear case supporting the validity of the patent in suit." *Id.* at 1359.

As explained in detail in the Weinstein Declaration, the '590 patent is invalid:

> 1) A body of work on file consistency control (concurrency, synchronization, criteria for performing synchronization), describing the key mechanisms commonly used today, was created in the 1980s and early 1990s.
>
> 2) Remote email access, including tracking and flagging of forwarded e-mail messages, was known and practiced prior to patent '590.
>
> 3) Piggybacking on HTTP for the control and movement of files, including messages, was known and practiced prior to patent '590.
>
> 4) It would be obvious to one of ordinary skill in the art that this prior art could be combined, in response to demand for distributed access to e-mail, into the mechanisms described in claims 23 and 31.

Exhibit 9, Weinstein Declaration at 18.

Dr. Weinstein concluded that each limitation of the '590 Patent is disclosed in the combination of A. Silberschatz, J. Peterson, P. Galvin, Operating System Concepts, Third Edition, Addison-Wesley, 1991, ISBN 0-201-51379-X and Terry Gray, "Message Access Paradigms and Protocols", revised Sept. 28, 1995, available at www.imap.org/imap.vs.pop.html.

*Id.* And Infowave has raised a substantial question of invalidity that precludes issuance of a preliminary injunction.

## III. THE REMAINING FACTORS WEIGH AGAINST PRELIMINARY INJUNCTION

### A. VISTO WILL NOT SUFFER IRREPARABLE HARM

#### 1. The "presumption" of irreparable harm is inapplicable

Visto mistakenly relies upon a "presumption" of irreparable harm. Only when a patentee makes a "clear" or "strong" showing of patent infringement and validity in a preliminary injunction proceeding is irreparable harm presumed. *See H.H. Robertson Company v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed. Cir. 1987); *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir. 1983). Where a patentee – like Visto – fails to make a clear showing of infringement, the presumption of irreparable harm is unavailable. *See High Tech. Med. Instr., Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1556 (Fed. Cir. 1995). The presumption is likewise unavailable where an alleged infringer – such as Infowave – has raised a "bona fide" question of invalidity or unenforceability. *See Tenement Co. v. Hako Minuteman, Inc.*, 651 F. Supp. 945, 961 (N.D. Ill. 1986).

Because Visto does not and cannot make a clear showing or infringement and Infowave has raised bona fide questions of invalidity and unenforceability, Visto is not entitled to any presumption of irreparable harm.

#### 2. Visto's unclean hands and undue delay in bringing this action is incompatible with its claim of irreparable harm

Visto concluded that the Symmetry Products did not include synchronization, yet Visto proceeded to burden this Court and Infowave with this lawsuit and request for preliminary injunction. Visto's unclean hands precludes issuance of a preliminary injunction:

> "It is one of the fundamental principles upon which equity
> jurisprudence is founded, that before a complainant can have a
> standing in court he must first show that not only has he a good
> and meritorious cause of action, but he must come into court with
> clean hands. He must be frank and fair with the court, nothing
> about the case under consideration should be guarded, but
> everything that tends to a full and fair determination of the matters
> in controversy should be placed before the court." Story's Equity
> Jurisprudence, 14th ed., at 98.  The governing principle is "that
> whenever a party who, as actor, seeks to set the judicial machinery
> in motion and obtain some remedy, has violated conscience, or
> good faith, or other equitable principle, in his prior conduct, then
> the doors of the court will be shut against him in limine; the court
> will refuse to interfere on his behalf, to acknowledge his right, or
> to award him any remedy." Pomeroy, Equity Jurisprudence, 4th
> ed., at 397. . . . "A court of equity acts only when and as
> conscience commands, and if the conduct of the plaintiff be
> offensive to the dictates of natural justice, then, whatever may be
> the rights he possesses and whatever use he may make of them in a
> court of law, he will be held remediless in a court of equity."
> *Deweese v. Reinhard*, 165 U.S. 386, 390.

*Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 244-45 (1933).

Furthermore, Visto's undue delay in bringing this action is wholly incompatible with its
claim of irreparable harm.  Visto has had knowledge of Symmetry Products for many years
through active competition and merger negotiations.  Nevertheless, Visto chose not to bring an
action until September 2003. "Preliminary injunctions are generally granted under the theory that
there is an urgent need for speedy action  to protect the plaintiffs' rights." *Citibank v. Citytrust*,
756 F.2d 273, 276 (2d Cir. 1985). "Delay in seeking a remedy is an important factor bearing on
the need for a preliminary injunction." *High Tech Med. Instr.*, 49 F.3d at 1557; *see also T.J.
Smith & Nephew Ltd. v. Consolidated Med. Equip., Inc.*, 821 F.2d 646, 648 (Fed. Cir. 1987)
(holding that patentee's delay in seeking preliminary injunction was "incompatible with the
emphasis on the right to exclude that is the basis for the presumption [of irreparable harm ] in a
proper case"). The significance of delay stems from the common sense reason that an undue

delay in taking action undermines a showing of irreparable harm – if the harm was so bad, why would one wait to seek a remedy?

**B.    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST ARE IN INFOWAVE'S FAVOR**

Given Visto's failure to show a likelihood of success on the merits, the balance of hardships strongly weigh against granting a preliminary injunction. The public interest further weighs against granting an injunction at this stage of the proceedings. While the public may favor the enforcement of valid patents, "[t]he cautionary corollary is that a preliminary injunction improvidently granted may impart undeserved value to an unworthy patent." *H.H. Robertson Company,* 820 F.2d at 391. The cautionary corollary rings loud here where the '590 patent appears weak at best and has not been tested by a thorough review of the prior art and a rigorous comparison of Symmetry Products with properly construed claims.

The real effect of granting an injunction, before any discovery, is to (1) disadvantage Infowave in this action and in the marketplace and (2) deny the public a superior, non-infringing product. An injunction would not protect Visto from any real harm. Accordingly, Visto's Motion should be denied.

## IV.    <u>AMOUNT OF BOND</u>

Infowave has demonstrated that Visto cannot establish a substantial likelihood of success on the merits. Visto has not suffered and will not suffer irreparable harm, and each of the remaining factors weigh against issuance of a preliminary injunction. In the unlikely event that the Court believes that a preliminary injunction is proper, the Court should either defer its ruling on the amount of bond or set the bond in the millions of dollars, rather than the meager $10,000 proposed by Visto.

Visto has failed to demonstrate the appropriateness of its request for a bond of a mere $10,000. This meager amount should be rejected by the Court as too low on its face. The Seventh Circuit in *Mead Johnson & Co. v. Abbott Laboratories,* 201 F.3d 883, 888 (7th Cir. 2000) observed that the "damages for an erroneous preliminary injunction cannot exceed the amount of the bond." The Court instructed that "when setting the amount of security, district courts should err on the high side." *Id.* The Court noted that in the event it is subsequently shown that the injunction was wrongfully entered, the defendant will still have to prove its loss but cannot collect for those losses above the bond amount. *Id.* An error in setting the bond too low creates an irreparable injury to Infowave while setting the bond too high has no such effect on Visto. Given the importance of the decision on the bond issue, Infowave requests that the Court defer any determination of the bond amount if and until such time as the Court determines that a preliminary injunction should be entered.

"The purpose of requiring security prior to issuance of an injunction or a restraining order is to guarantee payment of costs and damages incurred by a party who is wrongfully enjoined or restrained." 13 *Moore's Federal Practice* § 65.50[3] at 65-94 to 95 (3d ed. 1999) (collecting cases). "[T]he bond requirement serves to protect the interests of both parties. It assures the enjoined party that it may readily collect damages . . . in the event that it was wrongfully enjoined, without further litigation and without regard to the possible insolvency of the applicant, and it provides the plaintiff with notice of the maximum extent of its potential liability. . . ." *Phillips v. Cas. Schreiner Bank,* 894 F.2d 127, 131 (5th Cir. 1990) (ellipses in original). Thus, a court "usually will fix security in an amount that covers the potential incidental and consequential costs as well as either the losses the unjustly enjoined or restrained party will

suffer. . . ."  Wright & Miller, 11A *Federal Practice & Procedure* § 2954 at 292 (2d ed. 1995) collecting cases).

The declaration of Visto's Chief Technology Officer establishes that Visto's proposed bond is woefully inadequate.  Specifically, Visto recognizes that once a competitor "successfully enters an OEM agreement with a service provider or manufacturer," other competitors are locked out "for a number of years."  Mendez Declaration at ¶ 6.  Visto also recognizes that "Visto and Infowave compete for carrier deals," that "there are a limited number of carriers to deal with," and once a deal is made with a carrier, a competitor "is frozen out from making a deal with that carrier."  *Id.* at ¶ 7.  Given Visto's recognition of a potential lock and freeze out, it is not credible for Visto to then turn around and assert that a $10,000 bond would cover potential incidental and consequential cost and losses Infowave would suffer if unjustly enjoined or restrained through Visto's requested relief.

Furthermore, as explained by George Reznik, the Chief Financial Officer of Infowave:

> Infowave has spent millions of its shareholders dollars in the research and development of the Symmetry product line over the last several years.  Obviously, any injunction shutting this product out of the United States market would cause our shareholders to lose the opportunity in the United States to recoup the substantial millions of dollars invested in this product line.  Consequently, the $10,000.00 in United States currency bond proposed by Visto is a grossly inadequate amount of bond in light of the substantial damage which would be inflicted on Infowave and, in turn, our shareholders in the event a preliminary injunction were later found to be improperly granted.  Therefore, Infowave respectfully urges that a bond, if any, be in the millions of dollars.  Of course, Infowave fully believes that it does not infringe the patent at issue.

Exhibit 6, Reznik Declaration at 2.

Accordingly, Infowave respectfully submits that a bond in at least the millions of dollars should be required in the unlikely event a preliminary injunction is granted.  Any lesser amount would not adequately protect Infowave from the effect of a preliminary injunction.

## CONCLUSION

For all the reasons set forth above, Visto's motion for preliminary injunction is without merit and must be denied.

Respectfully submitted,

Robert M. Chiaviello, Jr.
Texas Bar No. 04190720
Brett C. Govett
Texas Bar No. 08235900
Email:  bobc@fulbright.com
Email:  bgovett@fulbright.com

COUNSEL FOR PLAINTIFF
ANTOR MEDIA CORPORATION

OF COUNSEL

FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas  75201-2784
Telephone:  (214) 855-8000
Facsimile:  (214) 855-8200

Paul Krieger
Texas Bar No.  11726470
Dudley Oldham
Texas Bar No.  15248000
FULBRIGHT & JAWORSKI L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77010
Telephone:  (713) 651-5151
Facsimile:  (713) 651-5246
Email:  pkrieger@fulbright.com
Email:  doldham@fulbright.com

Otis W. Carroll
Texas Bar No. 03895700
Wesley Hill, Esq.
Texas Bar No. 24032294
IRELAND, CARROLL & KELLEY, P.C.
6101 South Broadway
P.O. Box 7879
Tyler, Texas 75711-7879
Telephone: (903) 561-1600
Facsimile: (903) 581-1071
Email: otiscarroll@icklaw.com

## CERTIFICATE OF SERVICE

I certify that the above instrument was served in compliance with FEDERAL RULES OF CIVIL PROCEDURE on **March 1**, 2004, via Federal Express on the following parties:

Sam F. Baxter, Esq.
Kristi J. Thomas, Esq.
McKool Smith, PC.
505 East Travis Street
Suite 105
Marshall, Texas 75670

Ronald S. Katz, Esq.
Robert D. Becker
J. Bruce McCubbrey
Manatt, Phelps & Phillips, LLP
1001 Page Mill Road
Building 2
Palo Alto, CA. 94304